Good morning to both of you. I know you've both been here before. Each side will have approximately 15 minutes to argue, and I'm going to ask each of you to step up and identify yourselves. You may save out some time for both. Members of the Court, there's no question that Sgt. Zamohony is disabled. She had five knee surgeries, including a knee replacement, and the pension board granted her a non-duty disability. The only issue in this case is how was her disability incurred? And we would submit that the starting point for that proposition is the Illinois Supreme Court case of Johnson v. Retirement Board, where the Court said to determine whether a police officer is in the performance of an after-duty, you must look at the capacity that the officer is in at the time of the injury. On January 24, 2009, the date Sgt. Zamohony was injured, she was the shift supervisor in the Evergreen Park Police Department. She receives a call when she's out on the street in her squad car, and the call indicates from another police officer that a suspect fled the scene of a traffic stop. So in her capacity as shift supervisor, she goes to the scene where they finally apprehend the arrestee to assist in the apprehension and supervision of that arrest. In the board's decision, though, wasn't it their finding that the injury that caused the disability took place in March as opposed to the January 24 incident, and that that was the basis for their determining that it wasn't a non-duty injury? I believe when you read the decision, there are two facets to it. Number one, they said that she wasn't acting in the capacity of a police officer. Number two, she did not injure herself on January 24. That was the gist of the opinion. There was no finding in the board's decision that she injured herself on March 20. There was no finding that that was the cause of her injury. That wasn't even argued in the circuit court. All right. So their decision, you believe, is based on their determination that on the January 24 date that her responding to that call was not in the line of duty? Correct. All right. And I believe under Johnson and the other cases that we cite in pages 20 and 21 of our brief that she was, as shift commander, operating in her capacity to monitor what was going down with the arrest of this individual. The fact whether or not the individual was in custody when she got out of her squad car isn't an issue here. She was on the scene because she was shift commander, and she should have been on the scene. She was on the scene because she was responding to a call for assistance to help find this guy. So all of those factors point to the fact that on that date, January 24, 2009, she was, in fact, in the performance of an active duty under the pension code. The board also found that perhaps she was not injured at that particular moment. They said they looked at the tape, and the board said there's no obvious slippage. The officers who arrived on scene said that she was sitting in her car when she was there, and there's a video of her getting out of her car. And she stated she ran to make the arrest, and the video shows that she walked. Now, they listened to all this conflicting evidence and made a finding that she wasn't injured at that moment. How do we go against giving our standard of review? How do we find that that decision was against the manifest witness evidence? First of all, it's not only what she told the doctors. These doctors examined her. The doctors looked at the record, and if you watch the videotape, her statement was as she exited her squad car, she began to run. Not that she actually ran, but she began to run. You see her exit the squad car. She doesn't run. I agree with that, but it's not implausible that she could have hurt her knee as she said she did. The two things that the pension board relies on here are the videotape and the statements of the police officers. The statements of the police officers were taken a year and nine months after this injury occurred for whatever reason. Secondly, all the statements say is she was on the scene, and she didn't assist in the arrest. We didn't see her running, and we didn't see her hurt herself. Well, the fact that they didn't see her injure herself doesn't mean that the injury didn't occur. I agree. There's evidence to support it either way. My point is here the board made a finding. How do we get to the point where it's against the manifest witness evidence? Because a result, that result is, I think, you have to reach the opposite conclusion based upon what the evidence shows. The fact, and one of the, and I think what's more important here is they claimed, and the board claims in its initial report or decision, that there really was an injury on January 24th. If there wasn't an injury on January 24th, how does she go to the Little Company of Mary Hospital and is diagnosed by a medical person there of having a torn ligament in her knee and her knee was swelled up? If nothing happened, how does the Little Company of Mary medical report get written? Well, how, but aren't there like a couple of MRIs that follow that show no tear or no evidence? There was one MRI that was inconclusive, I think is the way that it was put. Inconclusive? Yes, inconclusive. And I don't think that's enough. I've had MRIs that are, I've had three knee surgeries, I've had MRIs that are inconclusive. We were only concerned with the record here. I understand. But didn't the board also make credibility determinations here? Yes, they did. Don't we have to, isn't that something that's for them and not us as a court of review? That's correct. If the credibility determinations are based on legitimate factors, and that's why I asked this court for permission to cite the Lambert v. Downers Grove for Firefighters Pension Board case. And that case is very similar to what we have here. We have a situation where the board finds the pension applicant in that case, Lambert, not credible. And because they found him not credible, they then discounted and disregarded all of their own physician statements. And each physician here determined that she was injured on the 24th of January, 2009. Yes. Let me ask you this other question. What is the standard of review? Is this clearly erroneous in this case because we have an administrative decision and we're applying the statutes to a given set of facts? Or are we looking at this for the manifest weight? Basically, at the trial court, I argued either a de novo standard of review or clearly erroneous. Why would it be de novo? Well, because there's a line of cases that indicate that the capacity that a police officer is performing in is a question of law. But when you're applying facts to a particular statute, I think, you know, it's either clearly erroneous and their factual findings are either, you know, manifest weight. I don't know that… And what is the standard when we say clearly erroneous? Isn't it that we have to be convinced that there was an error that occurred? That a mistake has been made.  were asked a series of questions by the board's attorneys, interrogatories, whether she suffered from any preexisting injury. All three doctors said no. Whether Sergeant Mahoney's explanation of how the injury occurred is consistent with their medical findings. All three doctors said yes. Whether the disability was a direct result of the 12409 incident. All three doctors said yes. And then we have, once again, we go back to the medical reports generated by Little Company of Mary Hospital. If she didn't hurt herself on January 24th, how could she walk in there and get a diagnosis? Did she also go into the station and indicate that she had been injured? Was that before or after she went to Little Company of Mary? Before. All right. So that date there is a report generated indicating that she had been injured in this particular incident. Right. And it's all consistent with her testimony. And I don't believe the video is clear enough. First of all, you can see snow and ice on the sides of the streets. It's January 24th. It's not inconceivable that there couldn't have been a patch of ice where she stepped out. What the police officers said in their late reports was, well, we didn't see any ice or snow on the street. But none of them said particularly we didn't see ice and snow where Sergeant Mahoney exited the squad car. Nobody was that close. Well, in the video, after she gets out of the car, you do see her walk to another location. Correct. She was walking towards Officer Johnson and where the arrestee was. And if you watch that video, she's got a funny gait. After getting out of the car? Yes. Well, I think, you know, I've watched it once, so I know I've seen it. I mean, the way we view it is you could see a hitch in her step. And more importantly, the video was sent to all three doctors, all three of the board's doctors. Dr. Mitton and Dr. Hill didn't address it, but Dr. Canastra did. Dr. Canastra said, I looked at the video, and it's still consistent with the injury occurring on that day. So according to Dr. Canastra, he watched the video, and he still concluded that she could have injured herself on that day, as she said. And there's no doubt here that there was an injury because she had five surgeries. She was also placed on life duty by the police department. How many times did she see doctors before the March incident? There were also indications of medical visits on multiple occasions, weren't there? Yes, there were. And she saw her own treating physician. She saw the doctor at Little Company of Mary Hospital. And obviously, she had knee problems. The MRI. But not before January 24th or 9th. No, no. And they did, I mean, there is medical testimony and medical documentation that after January 24th, she had injuries. Her injury, you know, suffered to that. It's the right foot. Correct. Or the right knee, rather. Also, I just want to comment on the board's position before this court that she was really injured on March 20th. That was never argued in the circuit court. There was no finding. When you read the board's decision, there's no finding that says that. The only finding that there is is finding number 52 in the board's decision, which says, on March 23, 2009, the applicant's right knee gave out when she was walking out of the police department's woman's bathroom. That's it. That's the only reference to the March incident at all. They never say she was injured in March, not January. And I believe that, you know, there's no finding in here that supports this claim that the injury occurred in March rather than January. And it wasn't argued below, so I believe it's waived. We would ask the court to reverse the board's decision and order the pension board to grant Sergeant Mahoney a line of duty disability. Before you sit down. Okay. Assuming for a moment that she was injured on 24th as she exited her car, she then went toward Officer Johnson. The board apparently made the finding that when she went toward Officer Johnson, the apprehension of the suspect had already been accomplished. And she was basically going toward him to accomplish administrative duties that were part of her job as a sergeant. And that in performing duties such as that is similar to putting a parking ticket on a car, and that that's not a line of duty activity. Of course, she said she was going to help in his arrest, but, you know, they made a finding that the radio call had said he'd been apprehended, and that's their finding. But she testified she didn't hear the call that he had been apprehended, and I'm saying it doesn't make a difference. The fact that she's shift supervisor, and there's a fleeing person that they're trying to arrest, and she's going there to assist in that arrest or supervise the situation, that creates the capacity. That's all you need. Whether he was in custody or not isn't the issue. Let's assume that on her way to this scene, she gets hit by a cop in her squad car. Once again, the capacity she is acting in is being shift supervisor to going to the scene of the arrest, and that's enough. Whether he's in custody or not doesn't make a difference in my opinion. When you look at Johnson and Sarkis and some of those other cases that we cite, basically she was doing what she was supposed to be doing as supervisor. Doesn't assisting an arrest present a much greater risk than writing a parking ticket, though? How do you know that when this guy's in custody and she approaches him that he doesn't break free and start fighting the police officers? Arrest situations are highly volatile situations, aren't they? I agree. And when you look at Johnson versus the Retirement Board, the seminal case on this whole issue, Officer Johnson was downtown somewhere, and a civilian asked him a question or yells to him or something for assistance. As Johnson's crossing the street to go talk to this civilian, he injures his knee. That's enough. As far as the Supreme Court said, the capacity he was operating in was one that average citizens don't do. Average citizens don't render assistance to pedestrians in downtown Chicago. Average citizens don't drive to the scene of an arrest to assist in that arrest. And that's what she was doing. So I will reserve, if there's no more questions, the balance of my time. All right. Thank you. Mr. Reamer. In the police court, Mr. Kuchelski, again, I think the court has to realize the board had two decisions that it had to decide or make in this case. One is whether or not Sergeant Mahoney was disabled. The board made that finding, and that was based on the medical evidence contained in the record. So the board did not disregard the medical record as related to or pertained to the cause of the disability. The second issue the board had to decide is, did Sergeant Mahoney become disabled as she indicated on January 24, 2009? And the answer to that was based on conflicting testimony that she was not, that she did not meet her burden. What was the conflicting testimony? The conflicting testimony was primarily, Your Honor, was the videotape. Sergeant Mahoney was very clear in her indication or her claim or contention what it is that how she injured herself. The problem is the board couldn't ignore the videotape. But the videotape isn't any evidence of medical injury at all. We could never rely on a videotape to interpret whether or not there was a medical injury as a result. That's not something I don't even think the board could do. The only way that a court can consider whether there has been an injury, a physical injury, is based upon testimony of an expert, that being a medical doctor. And in this case, three medical doctors testified that she injured herself on the, they were of the opinion that she injured herself on January 24, 2009, and that that injury, well, that was it. Now, I don't know how we can go from that, reject that, and then say the videotape shows she wasn't injured. Because a doctor, I mean, you'd have to get some kind of testimony, medical testimony, to contradict this other testimony. I don't think that the board can do it by looking at the videotape and saying. Well, I agree that it's a medical question whether or not there's a disability. And that's the case we cite in our brief, 2nd District Appellate Court, Jensen. Jensen is very clear. Jensen says that it's up for the doctors to decide whether or not there's a disability. I think that's a medical question. I don't disagree with you there. And the board didn't disregard the opinions of the doctors. Everybody did say that she had a disability. But the second question, which Jensen also says, is it's up to the board to decide, based on the totality of the circumstances, whether or not it's covered, it's part of a covered act. In other words, whether it's a line-of-duty disability. And that's where the conflicting evidence comes in. Well, are we looking at the 24th of January? Is counsel correct that there's a waiver of any argument that this was the result of the incident in the ladies' washroom on the March date? I have to respectfully disagree with counsel. First of all, the reason we're looking at January 24th of 2009 is because that's when plaintiff claims she injured her knee, which is how the videotape comes into play here. And don't three doctors say, three doctors selected by the board say, that she did, in fact, injure her knee January 24th? Well, I think all three doctors say, yes, it's consistent. One doctor says it's plausible. But, again, it's not up to the doctors to determine whether or not it's part of a covered act. The doctors don't know what the case law is. The doctors don't know all the facts. Well, let's talk about the covered act. Let's assume everything that she said was true, that there was a call, they were responding to a suspect, a fleeing suspect, a number of cars, police officers converge, and they're going to arrest someone. What is not a line-of-duty there? Well, I think based on the facts, every case is different. But I think if you accept the plaintiff's argument here, which obviously we don't, is that just being on duty in uniform is enough because you're acting in your capacity as a police officer. But that's not what she said, though. She said that she responded to a call to assist in the arrest of an individual and that she got out of her car and she was approaching someone who was in custody. Isn't that right? It's not just riding around in a squad car, being in a uniform. She was assisting other police officers in the apprehension of a wanted individual. Isn't that a dangerous situation? I think it could be a dangerous situation. I think the problem, Your Honor, is that it didn't happen on the video the way she testified. Well, that's a different question. If you want to put the active duty thing aside, which I really think you have to, put the active duty thing aside. The question is, did she injure herself on that date or not? So, you know, I must have watched that video a dozen times. I assure you, I watched it at least a dozen times. She says she gets out of the car and her right foot lands on a piece of ice and it slid forward. Are you telling me that just based on looking at that highly grainy video from some distance away, looking underneath the car door, which was, by the way, open in view of the camera, that you could see that her foot did not move? Is that what you're telling us? And that's the manifest way of the evidence that goes contrary to all these doctor visits and all these doctors' opinions, that that little video is enough to say that's not what happened? I don't think that one piece of the video is enough. I think it's the totality of the video that caused the board, not me, to make a finding that they didn't believe she got injured the way she said she did. Well, what did she go to that hospital for? Why did she go into the district office or the police station and say, I hurt my knee? Then she goes to, was it Little Company, Mary? I believe it was. And they examine her and her knee is swollen and there's an injury. There's medical documentation that very day. Then she has multiple visits after that. I mean, what was all that? How could you ignore it? Well, I don't think the board ignored it. I think the board listened to everything, waited, and then made a determination that it didn't happen the way she said it did. Now, is there a dispute that when she showed up at Little Company of Mary, that day there was something wrong? You know what? No, I don't think there is. But more importantly is what she testified to versus what the board had to look at on the video. And not just, as Justice Palmer indicated, just that one act. It was a series of things that were inconsistent with the video. We are, you know, bound by the record. There's nothing in the record to suggest that anything other than that incident caused her to go to that hospital, caused her to report that she had suffered an injury, and then, in fact, there's evidence at the examination at Little Company of Mary that she has a swollen knee and that there's an obvious injury. So, I mean, what else? Where can the board pull out this information? Well, again, I think the burden is always on the applicant. That's well established to prove that they were injured as a result of an act. All right. Let me ask you this. And that hadn't happened. All right. The last couple of pages, maybe a page and a half of the board's determination, it starts at the bottom of 23 and ends on 24. Yes. They devote virtually nothing to their analysis about this line of duty, act of duty, and they say that under the circumstances present in the facts in the record, the applicant's capacity of exiting the squad car did not involve a special risk, not orally assumed by citizens who exit cars. I mean, that, I think, is, you know, we don't get out of our cars to respond to arrests, but they cite that there's only three cases. They cite Fedorsky, Vilskoff, and Morgan. Do you know offhand what those cases involved? Generally, I do. Yeah. What were they? Vilskoff was my case. That was an officer who was on duty, claimed he was acting in his capacity as a police officer when he went outside while on duty to go back to return to patrol duties when another officer ran over his foot. Okay. He became disabled. So it wasn't a case where we had a video. Right. But it's also an officer running over his foot. I mean, he was just going to return a squad car. He wasn't responding to an arrest. Fedorsky was a passenger in a squad car. I believe Fedorsky was an evidence tech. He was riding in a car returning evidence to a crime scene or giving somebody else police equipment when he was involved in a motor vehicle accident as a passenger. The court said there's no special risk. No special risk. Okay. The last one is Morgan Police Officers here in Chicago says, I'm a police sergeant. I had to write police reports. I'm sitting at my desk. I fall out of my chair. I become disabled. His theory is I'm acting in my capacity as a police sergeant. Ordinary citizens don't write police reports. Okay. We don't have an arrest case. The board did not rely on any arrest case. None of these were an arrest case. That's correct. Howard? Are you really relying on the safety duty argument? I mean, do you really? Or is there a stronger argument that she wasn't injured in the way she says? Well, I think let's spend time on what we need to spend time on. I think the primary argument here is the board had the video, and it was contrary to what her testimony was as to what happened in material respects. I know counsel is citing the Lambert case as supplemental authority. There's also another case that's referred to in that, Rosak, which was his case where courts rejected credibility determinations. But in those cases where the court rejected a board's determination based on an applicant's credibility, it wasn't a dispute about whether somebody was disabled because in both of those cases the boards denied altogether, rejected medical evidence that somebody was disabled. This board didn't do that. Credibility determination here is the video primarily. That's not the only, but I think that's the primary credibility determination. Well, then in essence they're saying that the injury just, the disabling injury did not occur on January 24th. Not as she said it did. Here's the problem, I think, with the board's position in this case. The petitioner says that she got out of her car and subjectively she felt or heard something pop. Now, while the officers said, well, they didn't see it, there's nobody, there's actually no direct, what direct evidence could you have that nothing did pop, that nothing popped? And you have further the fact that she actually went to a physician that same day. You know, in other words, we have all of her testimony saying I was hurt, I got hurt, I heard it pop, I felt it pop. The contrary evidence is I didn't see anything. So that's what we're stuck with here. And I would agree with you, Your Honor, if it happened and we didn't have the videotape. Well, the videotape, when I saw it, I haven't looked at it 12 times, looked at it once. I think you can see that when her right foot goes down, it actually moves to the right. The board didn't see that. The board, she said. But I have a problem with the board sort of like using that in some way to determine a medical diagnosis. Well, I guess then if you. Is there anything in the record that says that when a person's knee pops, there's an outward manifestation that's seen? No, I don't think. And the three doctors, by the way, that the board chose took the position that it was that what she described as occurring to her on that day was consistent with their examinations, isn't it? So doesn't that imply that the fact that her knee popped, that doesn't mean you have to see it happen? The problem is the doctors didn't have her testimony because her testimony occurred afterwards. The board's got to base its decision. It is entitled to base its decision based on the totality of the record and the evidence. The board took the position in the brief all of a sudden that this injury occurred in March, coming out of a bathroom, right? That all of a sudden shows up in the brief that her injury was from March, March 20th, coming out of a bathroom. And what I want to know is how do you get to the conclusion that her injury occurred in March when she winds up at Little Company of Mary Hospital with a swollen knee on the very day of this incident that on January 30th she's diagnosed with a sprained right knee. On February 16th she goes to another doctor or she goes to a follow-up visit and she's diagnosed with a right knee medial meniscus tear and an MCL sprain. And on February 26th she sees an orthopedic surgeon. She makes about five doctor visits before this bathroom incident and all of a sudden now it's the bathroom incident that caused her knee injury. I just don't see how the board can come to that conclusion. What was she faking when she went to all these five doctors? Did she make the swollen knee up that the doctors at Little Company of Mary saw? Judge, I'm not saying what I think the board found because it's the board that made the finding, not me. I think what the board found is she was not credible that it happened the way she said it did. Could she have come to work that day with an injury? What substantive evidence does the board have that it didn't happen that way? The videotape, based on what she said. Based on her written statement to the board, she says, I got out of the car and I began to run. She didn't begin to run. She got out of the car. The board looked at that and said, we don't see it. The second thing is she said she immediately exited her squad car. The board looked at the videotape. She didn't immediately exit her squad car. In fact, another squad car pulls up, the one that ends up capturing this on the squad car camera. She's sitting in her car. The other officers get out. That's how we have this issue with the video. She says she immediately begins to run. She doesn't. She's seen walking.  She said she began to. I think there's a difference. As far as the video, I mean, she gets out of the squad car. I don't know. I'm not sure there's this long pause where some other officers are responding. But in any event, I still have this question about, you know, one of the doctors even said that the video, based on his review, I mean, each one had the view that her disability resulted from the 24th January incident. How do we say that the board can simply reject the medical testimony about this disabling injury that occurred, they say, January 24th, 2009? Jensen at 2nd District Public Court, I haven't found one in this district yet that says that, but we're not rejecting the medical opinion as to the cause of the disability. Nowhere in Section 3.1.1.5 does it say that the medical doctors get to determine the cause. That's the whole point. That they don't get to determine the cause? No. They can be asked the opinion, but I don't think the medical, I don't think Section 3.1.1.5. The board has to do that based on evidence in front of them. They do. They cannot pull it out of. No. And if it wasn't for the videotape, if it wasn't for the inconsistent statements to the doctors where she tells doctors during the course of her treatment, I was chasing the suspect. There was no evidence she was chasing the suspect. Those statements, that's impeachment, admittedly. But is that material? I mean, is it really material that she was, that she ran or she didn't run? Because really she says that this injury occurred in her first step. So is it material that she says I ran and then it turns out she didn't run? Judge, I think it is. I think it is, especially in light of the two cases relied upon by counsel in his supplemental materials, the Rozak and the Lambert case. In both of those cases, we didn't have a video of the actual incident, which is something the Board just couldn't walk away from. In Rozak and the Lambert case, the credibility determinations that were overturned were based on collateral or tangential matters. And I don't think, Judge, that anything is more important or material or relevant than an actual videotape of how the injury allegedly occurred. And I don't think there's any cases that I've read in anybody's briefs or found that are reported where there's an actual videotape, which the Board finds refutes how the applicant claims she sustained her disability. So I think it's apples and oranges when you look at the Rozak and the Lambert case. I think those cases were decided correctly because it was tangential issues. You didn't answer questions about how much money you made or where you lived or things that happened in physical therapy. Or the most recent one, the Lambert case out of the Second District, involved the applicant's demeanor before the Board. That's not what we're talking about. Are we reviewing the Board's decision as far as how the disabling injury occurred and when for manifest weight? Do you agree or do you think it's not? I believe, based on the cases, it's a manifest weight. But I think you could look at it under either the manifest weight or the clearly erroneous standard, and I think you still come to the same conclusion. I think I've used up my time. Unless you had any other questions, I would ask that you affirm the decision of the Trial Court and the Pension Board. Thank you. Thank you. Mr. Pachowski? Once again, I think this case boils down to was she injured on January 24th or not. The videotape is inconclusive at best. It doesn't show that, and again, Dr. Canastra, after viewing it, says it's still consistent that that's how she hurt herself. The other two doctors, I've had the tapes as well, they never addressed them, but they still made the conclusion that she injured herself on that day. So those doctors, those medical experts, looked at the tape and said it's conceivable that her injury occurred as she said. And again, how did she walk into Little Company of Mary Hospital and get a diagnosis if she didn't hurt herself? But isn't the board, in the final analysis, the arbiter of whether or not this disabling injury occurred the way that the officer here says it occurred, that they can consider everything, medical testimony and the videotape, and conclude that it didn't quite happen the way she said. We don't believe that this was the disabling injury. I don't think you could rationally reach that conclusion based upon the evidence here. Your only evidence is the videotape, which, again, I believe is inconclusive, and the officer's statements. Well, the videotape, at least in terms of what I observed, I mean, there's definitely no running at any point. The officer gets out of the car and then she, you know, you can't tell whether she's moving at a faster pace or not. I mean, it is, you know, I don't know. I'm not sure what it shows, but I think that there's certainly enough there that the board could draw its own conclusions about it. But the conclusions the board draws, that's why Lambert is important and to a certain extent Rozak. In both of those cases, the pension board relied on the finding of witness, the applicant not being credible, and therefore we can refute the doctor's reports based upon the fact that the witness is not credible. Both of those cases said the credibility findings in those cases were tangential at best. And that's the same situation here. Were she not credible? She said she got out of her squad car and began to run and they didn't see her run. And then they talk about all these other medical providers who, in their notes, said stuff that conflicted Sergeant Mahoney's testimony at the hearing. It wasn't they don't have Sergeant Mahoney saying that. What they have is a medical provider making notes. Perhaps the medical provider misunderstood. Perhaps he wrote down something, you know, wrong. We don't know that. But you can't impute her credibility based upon medical reports that somebody else prepared. You know, and Lambert says that there's an assumption that patients tell their doctors their true conditions and have no motive to falsify. I believe that applies here. I mean, she goes into Little Company and Mary and they can see her knee is swollen. They could see or diagnose a knee sprain. I mean, that happened. That's evidence. The videotape is not evidence. The videotape doesn't show anything, in my opinion, other than the fact that she didn't run. That's all it didn't show. Well, I asked counsel a couple minutes ago if that was a material discrepancy. And their position is that that was a material discrepancy that enabled the board to discount her credibility. So I would ask you to comment on that. I don't think it's a material discrepancy. I think it's tangential at best. You have to remember, when she testified, and what she said the day she wrote her report, on January 24th, she writes, I got out of my squad car and started to run or began to run. That doesn't mean she actually ran. The beginning of running is one step. And she took that step and her knee buckled on her. And that, to me, is not the linchpin of credibility in this particular case. If she didn't hurt herself on January 24th, then how do we have a medical report that says she did? It's not her statement. She goes to the doctor that very day, and they diagnose her as being injured. So then we have a video, and the video is inconclusive, but they go with an inconclusive video instead of a medical report. And then we have a series of different medical providers looking at her and diagnosing her prior to this March 20th date. And once again, with all due respect to Mr. Reamer, if you look at that, the arguments made in the circuit court, it was never mentioned at all. The March 20 incident was never mentioned at all by the board in the circuit court. And if you read the board's decision, there's no findings that that's what caused her injury. They pulled that out of the air in their brief. Once again, I'd ask the court to reverse the order. All right. We will take the matter under advisement, and we thank the attorneys. The case was well-argued and well-briefed.